## OLICE P. NICHOLSON, Respondent, v. INA MAE NICHOLSON, Appellant.*

Springfield Court of Appeals, July 2, 1924.

1. **DIVORCE: Trial Court is the Only Court That Can Make Order for Alimony.** The trial court is the only court that can make an order for alimony, and motion in appellate court for alimony pending appeal from decree of divorce, no appeal having been taken from denial of alimony by trial court, cannot be entertained.

2. ———: **Desertion: Acquiescence in Wife's Desertion: Facts Held to Show That Wife Went Away Without Intention to Desert, and Letters of Husband Held to Show That He Acquiesced in Her Staying Away.** In a husband's suit for divorce on the ground of desertion, facts held to show that wife went away in a huff, without intention to desert, and the husband's letters to wife held to show that he did not regard her separation as final and subsequently consented to and acquiesced in the separate status.

3. ———: **Wife's Refusal to Live Indefinitely in the House of Husband's Parents not Desertion.** It was the duty of the husband, if he could, to provide a home for his family apart from the home of his father, and he cannot sustain desertion by showing that his wife refused to live indefinitely in the same home with husband's parents.

4. ———: **Wife Leaving House Because of Ill Treatment by Members of Household, is not Guilty of Desertion, but May Charge Husband with Constructive Desertion.** It is the duty of the husband to furnish a home wherein the wife is free from abuse, ill treatment, and unwarranted interference from members of the household, and if such home is not provided, the wife is justified in leaving, and not only is not guilty of desertion in so doing, but in such case may charge the husband with constructive desertion.

5. ———: **Rule Stated as to When Wife is not guilty of Desertion in Leaving Home of Husband's Parents.** A wife who leaves the home of her husband's parents, to which he has taken her to live, because she cannot live happily there, is not, where there is no necessity for her so living because of the needs of the parents or husband, guilty of desertion which will entitle the husband to a divorce.

6. ———: **Essential Elements of "Desertion" Stated.** In order to constitute desertion, it is necessary to establish three facts: (1)

Cessation from cohabitation without reasonable cause for the space of one year; (2) the intention on the part of the alleged deserting party not to resume cohabitation; (3) absence of consent to the separation on the part of the alleged deserted party.

7. ———: **Deserted Party's Subsequent Acquiescence in Separation Precludes Divorce.** Divorce will not be granted on the ground of desertion where the alleged deserted party subsequently consents to, or acquiesces in, the separation.

*Headnote 1. Divorce, 19 C. J., section 643; 2. Divorce, 19 C. J., section 368; 3. Divorce, 19 C. J., sections 113, 114; 4. Divorce, 19 C. J., sections 113, 114; 5. Divorce, 19 C. J., sections 113, 114; 6. Divorce, 19 C. J., section 109; 7. Divorce, 19 C. J., section 120.

Appeal from Pemiscot County Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED (*with directions*).

*Shelly I. Stiles* for appellant.

(a) It is well settled that on question of fact in divorce cases, the appellate court will defer largely to the finding of the trial court, but will not be bound by it, and if, on a review of the testimony, a different conclusion is reached, the judgment of the appellate court will follow its own finding. Jones v. Jones, 208 Mo. App. 632, 635; Grove v. Grove, 79 Mo. App. 142; Griesedieck v. Griesedieck, 56 Mo. App. 94. (b) The statute requires that plaintiff be shown to be the innocent and injured party, before any decree for divorce can be granted; and in determining who is the innocent and injured party, courts are to be guided by the standard provided by the Legislature in specifying ground upon which a divorce may be granted; that is, his conduct should be shown not to be such as would make out a *prima-facie* case of divorce against him by the other party to make him an innocent and injured party. Jones v. Jones, 208 Mo. App. 632; Lawler v. Lawler, 76 Mo. 637, 642; Morrison v. Morrison, 62 Mo. App. 229; Nolker v. Nolker, 208 S. W. 129.

*Ward & Reeves* for respondent.

(a) Appellant has filed a motion in this court for alimony *pendente lite,* pending the appeal, and for the expenses of the appeal. This court has no jurisdiction to entertain such a motion. The circuit court had jurisdiction of this motion, even after the appeal was granted. State ex rel. v. Circuit Judge, 232 S. W. 1038; State ex rel. v. Circuit Judge, 206 Mo. App. 298; Libbe v. Libbe, 157 Mo. App. 701; State ex rel v. Court of Appeals, 99 Mo. 222. (b) When appellant left respondent in Caruthersville, Missouri, without cause and went to her people in the State of Tennessee and remained there one whole year, refusing during that time to live with respondent, she was guilty of desertion. Jones v. Jones, 55 Mo. App. 523; Deschodt v. Deschodt, 59 Mo. App. 102; Schuman v. Schuman, 93 Mo. App. 99; Freeman v. Freeman, 94 Mo. App. 504; Ashburn v. Ashburn, 101 Mo. App. 365. (c) The defendant was guilty of indignities as charged in plaintiff's petition, and plaintiff is entitled to a divorce on this ground. Testimony of plaintiff, Abs. 16, 17 and 33; Testimony of J. B. Nicholson, Abs. 36, 38, 46 and 48; Testimony of Mrs. M. J. Travis, Abs. 53 and 54; Testimony of Mrs. Margaret Searcy, Abs. 58 and 60; Testimony of Defendant, Abs. 71 and 76.

BRADLEY, J.—This cause is in divorce. Plaintiff was adjudged to be the innocent and injured party, granted a decree of divorce, and defendant appealed.

Defendant has filed in this court a motion for alimony pending appeal. It appears that she filed a motion in the trial court before the cause was tried, and that the court allowed her $50. After trial and judgment she filed another motion seeking to obtain means to prosecute this appeal. This motion was denied and no appeal therefrom was taken, but a motion filed here. We cannot entertain the motion. The trial court is the only court that can make an order for alimony. [Lawlor v. Lawlor, 76 Mo. App. 293; Motley v. Motley, 93 Mo. App. 473, 67 S. W. 741; Wilson v. Ruthrauff, 87 Mo. App. 226; Creasey v. Creasey, 175 Mo. App. 237, 157 S. W. 862.] The motion is overruled.

The petition charges indignities and desertion, but desertion was relied on. Defendant filed what is designated as an answer and cross-bill, but does not ask to be divorced. These parties married April 12, 1911, when rather young, while plaintiff was a student at a college near where defendant resided with her father and mother in Dixon county, Tenn. They spent about four years on the farm of the defendant's parents. In the spring of 1915 they moved to Blytheville, Ark., and plaintiff ran a dairy there through the summer of 1915. Then they moved to Caruthersville, Mo., and plaintiff continued in the dairy business, working for his father. They occupied a small house in Caruthersville near the home of plaintiff's father and mother. Some time in November or December, 1915, their house was broken into during their absence. Plaintiff's work required him to be away from home a good deal at night, and defendant was alarmed over the burglary, and they went to the father's home for awhile. We do not understand from the record that they moved into the house with the father, but just went over for awhile because of the wife's fright and upset on account of the burglary. They had not been at the home of plaintiff's father but a short time until defendant went back to the home of her father in Tennessee, and this going to her father's is the alleged desertion on which plaintiff relies.

Shortly after going to the home of plaintiff's father, plaintiff took sick, not serious however, and had been sick three or four days when defendant went away. She explains her going as follows: ''I went home in November just simply because I was just as nervous as I could be, and as Olice has just stated about those burglars. I was a nervous wreck, and I couldn't stand to be talked to like Mr. and Mrs. Nicholson did; and Olice laid there and let them talk to me that way. . . . I went home in November, and Olice had a little fever of course. I said, Olice, if you will move anywhere in the world; take me away from my people and your people, I will live on bread and water, but I most certainly cannot stand to be

talked to like they talk to me; and I can't stand it any longer. . . . The time they speak of that I left here and went home, I did not abandon him; but went home on a visit like I stated awhile ago, when he took me some-where.I could be treated pleasantly I would come to him any time he sent for me, regardless of where it was. I have never refused to live with him.''

Asked to specify how plaintiff's parents mistreated her, and what they said to her, defendant was rather indefinite. She did say, however, that Mrs. Nicholson said that she would give a $1000 if plaintiff and defendant had not married, and that they accused her of not loving her husband.

Plaintiff testified that he endeavored to prevail upon defendant to not go away and leave him. Plaintiff's father testified that he also endeavored to dissuade defendant from going away. He said: ''Olice's wife said she wasn't going to stay there any longer the night they had reference to this little rucus that came up; they were persuading her not to go off; she said, and of course she got pretty gay, and she said that she was going the next morning if No. 4 run. . . . I told her I would not go off and leave my sick boy. Yes, I tried to get her to stay. I didn't think she was leaving him right.''

Mrs. M. J. Travis, a sister of plaintiff, testified: ''I was living at my father's in December, 1915, while the plaintiff and his wife were living there in a little house near my father's. I was there when Mrs. Nicholson left and went back to Tennessee. At that time I heard her say why she was going. She said she was going to see her parents, and she was going back to her parents' home —she didn't have any reason. . . . Yes I know how they got along together. I have been with them quite a bit. My brother treated his wife just as good as she treated him, or better.''

This record convinces us that defendant went away in a huff without any intention of deserting her husband. She perhaps did not have just cause to go, but discord has come too often, where two families attempt to shelter under the same roof, to make desertion out of defend-

ant's going under the facts here. Defendant says that she did not intend to desert her husband. She is corroborated in this by many facts and circumstances. At the time she had a baby boy born of the marriage about three years of age, and was then pregnant, and gave birth to a baby boy the following July. For several years after she went away she repeatedly wrote defendant and asked that he prepare a place for them. She kept this up until it appeared to her that plaintiff did not intend to live with her again.

Let us see how plaintiff regarded the situation. Defendant visited plaintiff's father, where plaintiff made his home, every year, and brought the children. On one of these visits in 1920 plaintiff claims that defendant threatened to kill herself and him if he did not live with her. Of this plaintiff says: "I don't think there has been any communication since that time with reference to living together; that is when I decided she would be better off not with me and I would be better off without her." Defendant testified that on these visits to the home of plaintiff's father she and plaintiff had sexual intercourse whenever they got an opportunity; that plaintiff's folks, however, would not let, or did not let them room together. Plaintiff denies having such relations with defendant subsequent to her going away in 1915.

After defendant returned to Tennessee, plaintiff's father sent him to a business college in Kentucky. After completing his course plaintiff secured a position in West Virginia. While in West Virginia plaintiff and defendant continued their correspondence. Plaintiff's letters do not indicate that he regarded that defendant had deserted him and that the marital relation had ceased. Plaintiff addressed his family as "Dear Ina and Boys." Excerpts from these letters are as follows: January 1, 1918: "I received your letter and was as usual glad to hear from you. . . . Enclosed find my questionnaire. Go before a notary public or some member of the advisory board and answer the following questions: No. 9 on page 10; Nos. 24 and 25 on page 11. Give what papa and mama has sent you in with the amount in answering ques-

tion. 9.  I could not answer these questions on account of not knowing just what you had received.  Think out everything as it should be put; after you have filled send to papa at once for he has arranged for some time over seven days, but I don't know just how much.  At any rate act quickly.  I am sending you $10; will send more as soon as I can.  It is now one o'clock, so I will close. I shall write to you about our future in my next letter. Love the boys for me; give regards to all.  Lovingly, O. P. Nicholson.''

January 17, 1918: ''You spoke about when we could be together.  I think it is not wise to try to do anything toward moving anywhere till I know what the draft will do with me.  Perhaps by the time we get settled I would be called, then that would tear things up again.  I wish I could see you and the boys.  I can see them playing sometimes.  When I see any children passing I think of son and the baby.  .  .  .  Write me all the news.  Love the boys for me.  Excuse this letter, I have written it very hurriedly.  I will send you some more money before many days.  Yours lovingly, O. P. Nicholson.''

February 17, 1918: ''I received the boxes and appreciated them very much, though they were a little stale. It is most too far to send things, especially since I have a good place to board.  But anything you send always tastes like more.  .  .  .  I am making $70 per month and have the promise of a raise soon.  I can get more other places, but think since there are so many of the office boys in class A-1 I can get in an office out where I would like to take you and the boys.  This is no place to keep them.  I am in A-4th class.  Perhaps I have told you once.  I have to pay $1 per week to get my laundry done.  I am not buying any clothes for fear I will have to go to the army.  .  .  .  I am sending you $7, and will continue to send small amounts as fast as I make them. After paying my regular expenses seems like I haven't much left.  I would enjoy being with you today.  But since I have been preparing for work so long I think I had better stick while I am here and get a hold of as much money as I can, for we can't tell what may happen

before the war is ended. Write to me giving all the news. Love the boys for me; wish I could be with you and them. I enjoy your letters very much. I am, Yours lovingly, O. P. Nicholson.''

June 23, 1918: ''Don't know what I will do about another place; I hardly know which is best for me, staying here or changing to some other place. Though so long as I am here we can never be together; 1 would not want to ever bring you here. I guess we can decide upon something when I get a vacation, which will be soon I am sure. Love the boys for me. I think of you and them often. Lovingly, O. P. N.''

January 22, 1919: ''Your letter received tonight and was glad to hear from you. I'm well and trust you are. . . . In regard to the house here, it is out of the question, for I have spoken to the superintendent several times. Only the men that dig coal are taken into consideration, because they can get men to do my work that does not want a house. Speaking about the package I have sent tracer after it. We should soon know where it is. I think of you and the boys real often and wish that I could see you. Though if I stay here it will be quite awhile before we can be together. . . . Since it is getting late I shall stop for this time. Love to all, O. P. Nicholson.''

June 11, 1919: ''I don't know whether I will stay here yet. Anyway, I don't know when we can keep house. Not soon I fear. . . . Heard from the home folks not long since. They were well. Do you expect to go out there this summer? Will send you some money in next letter. Love the boys for me. Lovingly, Olice.''

May 10, 1920: ''Since losing my clothes burned, I'm most compelled to postpone my trip home for awhile; and since I have thought it over it would be better to be at home after they have finished the crop. I'm sorry, but for various reasons I'm short for cash just now and can't send you any money in this letter. But will soon send you money enough to pay your debt and buy you and the boys clothes till you go out home, then will be in position to send enough for you to prepare for and take

214 M. A.—37.

a trip on. Would love to see you and the boys. But honest, dear, I don't have the slightest idea when we will keep house. You ask me in every letter, but that is the truth; I really can't say when. But not so long as I am in the coal fields for various reasons should you want to know. . . . Love the boys for me and tell them not to forget daddy. Lovingly, O. P. Nicholson.''

It is clear that defendant did not consider that she and plaintiff were finally separated. Plaintiff may not have been in good faith, but his letters indicate that he did not regard the separation as final. Unless he meant to again live with his family his letters were written to deceive. The notion of finality, judging from this record, came from plaintiff and not from defendant. Plaintiff says that defendant refused to live with him in Caruthersville. He did not after defendant went away in December, 1915, provide a place in Caruthersville or elsewhere, and ask his wife to live with him. He did nothing towards providing a home except to hold out what turned out to be a false hope. She says that she told him that she would live with him anywhere except with his people or her people and this is not denied. It was plaintiff's duty, if he could, to provide a home for his family apart from the home of his father, and he cannot sustain desertion by showing that his wife refused to live indefinitely in the same home with plaintiff's parents. It is the duty of the husband to furnish a home wherein the wife is free from abuse, ill treatment, and unwarranted interference from members of the household, and if such home is not provided the wife is justified in leaving, and not only is not guilty of desertion in so doing, but in such case may charge the husband with constructive desertion. [9 R. C. L., p. 366, sec. 152; Brewer v. Brewer, 79 Neb. 726, 113 .N. W. 161, 13 L. R. A. (N. S.) 222; Hall v. Hall, 69 W. Va. 175, 71 S. E. 103, 34 L. R. A. (N. S.) 758.]

Lindenschmidt v. Linderschmidt, 29 Mo. App. 295, was an action by a wife for separate maintenance. It appears in that case that the wife left the home occupied by herself and husband, and also by the husband's mother and married sister and her husband. The wife

left because of discord between her and her husband's mother and sister. In that case, however, it appears that the husband consented at the time of the wife's going, but it further appears that she also remained away with his consent. In that case the court ruled that while a wife remains away from her husband's domicile with his consent he is bound in law to support her. In the case at bar the defendant did not directly consent to his wife going away, but he did consent to and acquiesce in her staying away and did not make any effort to induce her to return. The court in the Lindenschmidt Case said that a wife is bound, if the husband requires it, to return to his house and share the lot which he shares, whether he sees fit to allow other members of his family to live with him or not, and that if she refuses to do this, she will forfeit her right to support, that is, be guilty of desertion. But the court goes on to say that if she does return the husband must protect her from insult or abuse at the hands of other members of his family. The statement in that case that the wife is bound, if the husband requires it, to return to his home and share the lot which he shares, whether he sees fit to allow other members of his family to live with him or not, is *dictum,* and such statement, unqualified, is not the law. The courts rule generally that each case must rest upon its own peculiar facts where discord arises because of a husband taking his wife into his father's home or by taking members of his father's family into his own home. [9 R. C. L., p. 366, sec. 152.] The same statement as to the wife's duty is made in Jones v. Jones, 55 Mo. App. 523, as in the Lindenschmidt Case; but such statement is there no more than *dictum,* because in that case the husband had repeatedly sought to induce his wife to return to him, but she refused, and the court there said that there was not a shadow of evidence tending to prove that appellant consented or connived at the absence of his wife. And under the facts of that case the court ruled that the fact that the mother of the husband was a member of his family was not sufficient to justify the wife in refusing to share his home. Messenger v. Messenger, 56 Mo. 329, is cited

in the Jones Case to support the statement that if a husband sees fit to invite members of his family to live with him his wife cannot on that account leave his home. No question of that character was involved in the Messenger Case.

A wife who leaves the home of her husband's parents, to which he has taken her to live, because she cannot live happily there, is not, where there is no necessity for her so living because of the needs of the parents or the husband, guilty of desertion which will entitle the husband to a divorce. [2 R. C. L., Supp., p. 787, sec. 152; Marshak v. Marshak, 115 Ark. 51, 170 S. W. 567; Ann. Cas. 1916 E, 206, L. R. A. 1915 E, 161.] We think that the statement last made is and ought to be the law. Such we think is in accord with common sense and justice, and permits each case to depend on its own facts. To say that a wife is bound in any event to live in the home of her husband's parents, or to take them into her home, if her husband "sees fit," is not and ought not to be the law. In Coulter v. Coulter, 175 Mo. App. l. c. 6, 161 S. W. 281, the court says that it is still the law of this State that the wife is bound to follow the fortunes of her husband and to live where he chooses to live and in the style and manner he may adopt, but that this rule is not intended to make the wife the slave of her husband nor to give him the right to subject her to avoidable indignities. [See also Girdner v. Girdner, 230 S. W. (Mo. App.) 382.]

Plaintiff in the cause at bar is seeking a divorce on the ground of desertion. In order to constitute desertion it is necessary to establish three facts: (1) Cessation from cohabitation without reasonable cause for the space of one year; (2) the intention on the part of the alleged deserting party not to resume cohabitation; (3) absence of consent to the separation on the part of the alleged deserted party. [Playmate v. Playmate, 180 S. W. (Mo. App.) 29.] In the Playmate Case a divorce was denied on the ground that the alleged deserted party had consented to the desertion. In the case at bar it is quite evident that the defendant, the alleged deserting party, did not intend never to again resume cohabitation. It is also

a rule that a divorce will not be granted on the ground of desertion where the alleged deserted party subsequently consents to or acquiesces in the separation. [Simpson v. Simpson, 31 Mo. 24; Droege v. Droege, 55 Mo. App. 481.] Plaintiff in the instant case did not consent at the time, but there is no escape from the conclusion that he subsequently consented to and acquiesced in the separated status.

We do not think that plaintiff made out a case of desertion against his wife. The judgment should be reversed and the cause remanded with directions to dismiss plaintiff's bill, and it is so ordered. *Cox, P. J.,* and *Farrington, J.,* concur.